FILED

2020 Aug-28  AM 10:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| JEFFREY L. FLEENOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:18-cv-817-GMB |
| | ) | |
| WARRIOR MET COAL MINING, | ) | |
| LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>**MEMORANDUM OPINION**</u>

Pending before the court is the Motion for Summary Judgment (Doc. 29) filed by Defendants Warrior Met Coal Mining, LLC; Warrior Met Coal Intermediate Holdco, LLC; and Warrior Met Coal, Inc. (collectively, the "defendants"). Plaintiff Jeffrey L. Fleenor has filed a response to the motion (Doc. 38), and the defendants have filed a reply brief in support. Doc. 40. Fleenor also has filed a Motion to Strike (Doc. 36) and Motion for Leave to File Sur-Reply or Alternatively Motion to Strike (Doc. 41). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge. After careful consideration of the parties' submissions and the applicable law, and for the reasons that follow, the court concludes that the Motion for Summary Judgment is due to be granted in part and denied in part, and that the other pending motions are moot.

## I.  JURISDICTION AND VENUE

The court has jurisdiction over the claims in this lawsuit pursuant to 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction, nor do they contest that venue is proper in the Northern District of Alabama.  The court finds adequate allegations to support the propriety of both.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Defendant Warrior Met Coal Mining, LLC ("WMC") produces and exports metallurgical coal. Doc. 30 at 4.  WMC is a wholly-owned subsidiary of Warrior Met Coal Intermediate Holdco, LLC ("WMC Holdco"), which is a holding company wholly owned by Warrior Met Coal, Inc. ("WMC, Inc.").  On March 8, 2016, WMC hired Fleenor, who was 64 at the time he filed suit, as a shift foreman at Mine No. 4 in Brookwood, Alabama. Doc. 38-2 at 2–3.  Fleenor began working in underground mining in 1974 and had approximately 42 years of mining experience when WMC hired him. Doc. 38-2 at 2.

As a shift foreman, Fleenor organized and managed each day's shifts, including those for WMC's longwall section, belt crews, and locomotive crews. Doc. 31-1 at 22.  The shift foreman position "is the first line of management overseeing underground operations." Doc. 30 at 4–5.  If Fleenor delayed "lining up" the employees for a shift, these delays harmed production and forced WMC to pay overtime to any employees who were not relieved on time by their replacements.

Doc. 31-1 at 22–23.  Delays also could cause safety issues if they contributed to employees who were fatigued on the job. Doc. 31-1 at 22.

Mine Manager Brian Frederickson testified that Phillip O'Rear, who was Fleenor's direct supervisor, Doc. 31-1 at 25, counseled Fleenor for failing to start a longwall shift on time around December 2016. Doc. 31-2 at 14–15.  Frederickson recalled that Fleenor did not start the shift at all. Doc. 31-2 at 15.  O'Rear, who submitted a declaration, did not testify to this occurrence.[1] *See generally* Doc. 31-13.  According to Frederickson, Fleenor told O'Rear that he did not believe he had the necessary manpower to start the shift. Doc. 31-2 at 15.  However, Frederickson believed that Fleenor had enough people. Doc. 31-2 at 15.  Frederickson advised Fleenor that he should timely start all longwall shifts in the future. Doc. 31-2 at 16. According to Fleenor, this conversation never occurred and no one ever mentioned this shift to him, either at the time or later. Doc. 38-2 at 4.  There is no contemporaneous documentation of this incident, and according to Frederickson "the only one that can attest to it is Phillip [O'Rear]." Doc. 31-2 at 17.

Frederickson testified that several weeks later, in January 2017, Fleenor again failed to start a longwall shift on time. Doc. 31-2 at 17.  Frederickson explained that Keith Shalvey, the Deputy Mine Manager, counseled Fleenor on this occasion.

---

[1] Frederickson suggested in his deposition that counsel should "ask Phillip O'Rear" about this occurrence, Doc. 31-2 at 14 & 15, but no deposition of O'Rear is in the record before the court.

Doc. 31-2 at 18.  While he does not know what Shalvey told Fleenor "word for word," Frederickson believes that Shalvey "basically" informed Fleenor that this was his second late shift start and that he needed to follow instructions.[2] Doc. 31-2 at 18.  Fleenor again contends that this conversation did not occur, Doc. 38-2 at 4, and the incident was not documented in writing. Doc. 31-2 at 18.

In late February or early March of 2017, Frederickson contends that Fleenor failed to start a third longwall shift on time. Doc. 31-2 at 19.  Frederickson spoke with Fleenor to advise him to start his shifts on time, and Frederickson also told him that he should not need oversight to comply. Doc. 31-2 at 19.  Fleenor said that the shift was delayed because of a damaged mine chute. Doc. 31-2 at 19.  Specifically, he claimed that a hole in the chute was leaking a "massive amount of coal." Doc. 38-2 at 5.  Frederickson disagreed that the hole in the chute necessarily delayed the shift, maintaining that Fleenor could have proceeded safely by "station[ing] someone there to shovel what accumulations [of coal] would have spilled." Doc. 31-2 at 19.  Fleenor contends that he did not have the manpower necessary to shovel the leaking coal back onto the conveyor belt. Doc. 38-2 at 5.  Additionally, while Fleenor inspected the conveyor belts in advance of the shift, a worker already had begun to repaire the hole. Doc. 38-2 at 5.  Fleenor stated that Frederickson, who never saw the hole, nevertheless told Fleenor that he "made the right call" by completing the

---

[2] There is no testimony from Shalvey in the record.

repair before the shift. Doc. 38-2 at 5.

In October 2017, after a six-month absence due to an on-the-job injury, Frederickson told Fleenor that "his shift was not starting on time." Doc. 31-2 at 20. Frederickson again counseled Fleenor, who explained that the delay was caused by his inability to recognize certain people on his shift because of employee turnover that occurred during his absence. Doc. 31-2 at 21.  Fleenor vowed to become familiar with his new employees so that he could get his shifts started on time. Doc. 31-2 at 21.  Fleenor testified that O'Rear had given him with an incorrect shift roster, causing "a lot of confusion." Doc. 38-2 at 6.  He explained that the delay also related to an inoperable mine elevator, which "caused major issues in getting the workers underground in a timely manner." Doc. 38-2 at 6.  Even so, the next day, O'Rear told Fleenor that he "did a great job starting the shift in a timely manner" and did "much better" than two other shifts that day. Doc. 38-2 at 6.

However, about a week and a half later in mid-October, Fleenor failed to start another shift on time according to Frederickson.  Fleenor explained that he still was struggling to get to know his new employees. Doc. 31-2 at 22–23.  Fleenor also maintains that, during this time, the primary mine elevator remained inoperable. Doc. 38-2 at 6–7.  He claims that no one counseled him about this incident, which was "obviously not [his] fault." Doc. 38-2 at 7.  According to Frederickson, several WMC employees, including members of the longwall crew, complained in late

October 2017 to management that it took significantly more time to perform routine maintenance on Fleenor's shifts than on the shifts of other foremen. Doc. 31-2 at 23–24.  Frederickson said that these complaints ultimately convinced him to meet with O'Rear and Darin Arnold to discuss a demotion for Fleenor. Doc. 31-2 at 24.  According to Fleenor, the incident leading to these complaints occurred because the "belt crew" did not timely replace rollers on a conveyor belt in the last week of October 2017. Doc. 38-2 at 7.  As with all other maintenance, Fleenor could not start the shift until the rollers were changed. Doc. 38-2 at 7.  Fleenor states that no one confronted him about this incident or "claimed that [he] did anything wrong." Doc. 38-2 at 7.

WMC maintains that Fleenor initially resisted its methods and struggled to adjust to its expectations, insisting on "doing things the way he had done them in the past for his previous employer, Jim Walter Resources." Docs. 30 at 8–9 & 31-13 at 1.  O'Rear also heard that Fleenor opposed a request to complete a functional capacity examination following his leave of absence, a standard requirement for all WMC employees. Doc. 31-13 at 2.  Fleenor maintains that he was not required to take an examination, only told that he might have to do so if ordered by a doctor. Doc. 38-2 at 7.  According to Arnold, the Deputy Mine Manager and O'Rear's direct supervisor, other managers observed that Fleenor appeared "lost" and particularly struggled when assistant shift foreman Vince Netherly was not able to assist him.

6

Doc. 31-14 at 3.

After a discussion with O'Rear and Arnold, Frederickson decided to demote Fleenor from mine foreman to outby foreman. Doc. 31-2 at 25.  While Frederickson consulted O'Rear and Arnold, he made the decision alone. Doc. 31-2 at 27. Frederickson testified that he made this decision based on the overall performance of Fleenor's shifts and his inability to improve after various conversations and counseling sessions. Doc. 31-2 at 25–26.  On October 31, 2017, Frederickson met in his office with Fleenor and Human Resources Manager Sherry Sterling. Docs. 31-1 at 42–43 & 31-2 at 28.  Frederickson told Fleenor that he was being demoted to outby foreman because of performance issues. Doc. 31-1 at 43.  Specifically, Frederickson says that he told Fleenor he was demoted because he had "been having issues getting [his] shift started on time, with repairs being made to the belt line not going well." Doc. 31-2 at 28.

According to Sterling, Frederickson told Fleenor that he "couldn't get his shift started on time" and that "there had been other situations where [Frederickson] specifically told [Fleenor] to do something and [Fleenor] didn't do it and [Frederickson] had gotten complaints from other employees." Doc. 31-3 at 14. Fleenor expressed concern that the demotion would result in a significant pay decrease. Doc. 31-1 at 43.  Frederickson told Fleenor that he was not being fired and that he still brought value to WMC, but that he would better serve the company as

7

an outby foreman. Doc. 31-2 at 28.  Fleenor responded that he would not accept a demotion. Doc. 31-1 at 43.  Frederickson explained that he could either accept the demotion or quit. Doc. 31-2 at 28.

The parties disagree about what happened next.  Frederickson testified that Fleenor walked out of the room and began to yell in the hallway. Doc. 31-2 at 29. After three to four minutes, Sterling asked Frederickson to help him calm Fleenor. Doc. 31-2 at 29.  About five minutes after that, Frederickson told Fleenor that he needed to leave the property. Doc. 31-2 at 29.  At that point, Fleenor got angrier and told Frederickson, "That's your problem—you don't respect anybody here." Doc. 31-2 at 29.  As Fleenor continued to "ramble at the mouth," Frederickson reiterated that he needed to "get the hell off the property." Doc. 31-2 at 29.  Frederickson testified that he asked Fleenor if he was quitting, and Fleenor responded, "I guess my lawyer will let you know that." Doc. 31-2 at 28.

Fleenor testified that he walked out of the room after Frederickson told him that he could either accept the demotion or quit. Doc. 31-1 at 44.  When Sterling asked him if he was resigning, he replied "absolutely not," but also told her that he was going to talk to his attorney. Doc. 31-1 at 44.  She then asked Fleenor for his rescuer device.[3] Doc. 31-1 at 44.  Sterling testified that Fleenor "went back to the

---

[3] A rescuer device is a "portable oxygen source that provides breathable air when the [underground] environment lacks oxygen or is contaminated with toxic gases." Doc. 38-2 at 8.  All

bath house area and got all of his belongings and . . . handed me his rescuer." Doc. 31-3 at 14.  According to Fleenor, Sterling took the rescuer device from him and, when a manager takes a rescuer device "in the coal business, [it] means that the miner no longer works for the company and is fired." Doc. 38-2 at 8.  When Fleenor walked back into the hallway to gather his belongings, Frederickson walked out and told him to "get the hell off the company property." Doc. 31-1 at 44.  Fleenor replied that he was trying to gather his belongings and "just trying to be cool," but left once Frederickson commanded him to leave the property. Doc. 31-1 at 44.  Fleenor maintains that he never resigned and never told any WMC employee that he resigned. Doc. 38-2 at 8.  Rather, he claims that he was terminated. Doc. 38-2 at 8.

Fleenor maintains that he was not responsible for the delays in starting the longwall shifts.  According to Fleenor, the delays occurred on Sundays, which were reserved for mine maintenance. Doc. 38-2 at 3.  Production shifts could begin only after all maintenance had been completed. Doc. 38-2 at 3.  Fleenor states that it is the maintenance workers' responsibility to complete their work and then notify the foreman when it is finished. Doc. 38-2 at 3.

Frederickson testified that he "rotated the shift foremen all around [on a monthly] basis" after Fleenor's employment ended. Doc. 31-2 at 29.  He believes

---

miners "must have them on at all time[s] while working underground." Doc. 38-2 at 8.  Sterling denies asking for Fleenor's rescuer device. Doc. 31-3 at 14.

Chris Smith "possibly"[4] filled in, along with Perry Scarborough, Chris Gable, and Gilbert Saba. Doc. 31-2 at 29.  He estimates that Scarborough was in his "late 40s, approximately 50," Gable was "[p]robably mid-40s," and Saba was in his "early- to mid-50s." Doc. 31-2 at 29–30.  Chris Smith was 33. Doc. 38-3.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported motion

---

[4] Although this is the only evidence in the record reflecting Smith's utilization as a backfill for Fleenor, in briefing the defendants do not dispute that Smith served as one of Fleenor's replacements, as discussed below.

for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted).  The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient

. . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## IV.  DISCUSSION

In his Amended Complaint, Fleenor asserts claims under the Age Discrimination in Employment Act ("ADEA") and Alabama Age Discrimination in Employment Act ("AADEA"). Doc. 10 at 5–8.  Fleenor also brings state-law claims for wrongful termination and negligent hiring, training, supervision, or retention. Doc. 1 at 8–11.  The defendants argue that summary judgment is due to be granted on all of Fleenor's claims.

### A.    Wrongful Termination

In his response to the motion for summary judgment, Fleenor advanced no argument in support of his wrongful termination claim.  A plaintiff abandons any claims he fails to address in a response to a properly-supported motion for summary judgment. *Brackin v. Anson*, 585 F. App'x 991, 994–95 (11th Cir. 2014); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is on the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").  Accordingly, the

defendants are due summary judgment on this claim.[5]

## B.   Age Discrimination

With respect to Fleenor's age discrimination claims, the defendants argue that Fleenor has not satisfied his burden to demonstrate a *prima facie* case of age discrimination and that, even if he had, the defendants prevail at the burden-shifting stage.  Fleenor contends both that he has successfully established a *prima facie* age discrimination case and that he has demonstrated that WMC's stated reasons for its decision are a pretext for discrimination.

The ADEA and AADEA prohibit employers from discriminating against employees because of their age.[6]  29 U.S.C. § 623(a)(1); Ala. Code § 25-1-21. A plaintiff may prove an age discrimination claim by direct or circumstantial evidence. *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012). Where, as here, an age discrimination claim is based on circumstantial evidence,

---

[5] In response to the motion for summary judgment, Fleenor also filed a motion to strike, arguing that certain evidence relied upon by the defendants in their motion is irrelevant. *See generally* Doc. 36.  Because the court will sift through the evidence in the record and decline to consider legally irrelevant evidence on its own accord, this motion is moot.  Additionally, Fleenor has filed a Motion for Leave to File Sur-Reply or Alternatively Motion to Strike (Doc. 41), arguing that the defendants have advanced arguments in their reply brief that did not appear in their initial brief. Wile the court generally agrees with the premise of the motion, it has addressed these arguments in the discussion below and therefore finds this motion to be moot.

[6] Courts analyze claims under the ADEA and AADEA using the same analytical framework. *King v. CVS Caremark Corp.*, 2 F. Supp. 3d 1252, 1258 (N.D. Ala. 2014).  While it is "not clear whether a plaintiff may simultaneously pursue claims under the AADEA and ADEA," *Collier v. Harland Clarke Corp.*, 379 F. Supp. 3d 1191, 1202 n.8 (N.D. Ala. 2019), the defendants have moved for summary judgment on both claims jointly on substantive grounds and have not argued that the claims are duplicative or that Fleenor's AADEA claim is due for dismissal for any other reason. *See* Doc. 30 at 13 n.4.

courts employ the well-worn burden-shifting framework first established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.*

That framework first requires a plaintiff to establish a *prima facie* case of employment discrimination by showing that he (1) is between the ages of 40 and 70; (2) was subjected to an adverse employment action; (3) was replaced by a substantially younger person, or a substantially younger person was treated more favorably; and (4) was qualified for the position for which he was rejected. *Id.* If he does so, this creates a presumption of discrimination. *Id.* The burden then shifts to the employer to rebut this presumption by offering evidence of "a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the employer does so, the burden shifts back to the plaintiff to "show that the employer's stated reason is a pretext for discrimination." *Id.*

### 1.    Prima Facie *Case*

It is undisputed that Fleenor is between the age of 40 and 70 and suffered an adverse employment action.[7] Thus, the two elements at issue are whether Fleenor was qualified for the mine foreman position and whether he was replaced by a substantially younger employee. Nevertheless, the defendants raised all of their

---

[7] The parties disagree over how Fleenor's employment ended—with WMC claiming that he quit and Fleenor contending that WMC fired him. This distinction is immaterial to Fleenor's *prima facie* case because WMC admits that it did make the decision to demote Fleenor, which is an adverse employment action. *See, e.g.*, *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (including demotion as one form of an adverse employment action).

arguments in opposition to Fleenor's *prima facie* case for the first time in their reply brief, and "[a]rguments not properly presented in a party's initial brief or raised for the first time in a reply brief are deemed waived." *Egidi v. Mukamai*, 571 F.3d 1156, 1163 (11th Cir. 2009).

The only argument against Fleenor's *prima facie* case that is properly before the court is the claim that "there is no evidence that any employee in particular directly replaced" Fleenor. Doc. 30 at 17. This statement is not supported by any controlling case law requiring Fleenor to demonstrate that he was "directly replaced" by a single substantially younger individual. Frederickson's testimony suggests that WMC employed four people as mine foremen after Fleenor's employment ended— Chris Smith, Chris Gable, Perry Scarborough, and Gilbert Saba. Doc. 31-2 at 29. This court is not familiar with any requirement in the law that a plaintiff be replaced by just one substantially younger individual, and the defendants have not offered any such authority. The record reflects that Fleenor was not replaced by any one individual because WMC rotated foremen in and out of different shifts on a monthly basis in his absence. Doc. 31-2 at 29. While the record may be scant on this issue, the defendants have not directed the court to any evidence rebutting Frederickson's testimony.

It is nevertheless Fleenor's duty to establish a *prima facie* case of age discrimination, so the court must examine the record evidence to determine whether

15

he has done so.  "In assessing a plaintiff's qualification for a position, we examine his skills and background." *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1299 (11th Cir. 2015).  Fleenor had 44 years of mining experience and testified that he regularly received praise for his performance at work, including from Frederickson, WMC's Chief Operating Officer ("COO") Jack Richardson, and other employees. Doc. 31-1 at 9, 20, 42 & 47.  For example, Chris Thielen, a Deputy Mine Manager, told Fleenor that he hated to see that he was leaving because he was "such a good employee," and James Jones stated that he would be in "seventh heaven" if he had "30 people as good as" Fleenor.[8] Doc. 31-1 at 9.  On another occasion, Jones called him "the best man on the property" and said he wished "everybody cared as much about the mines as [Fleeonor] did." Doc. 31-1 at 20.  The son of COO Jack Richardson, Chase Richardson, told Fleenor after his injury that Jack was "glad you're back" after Fleenor said that there were "two" who did not want him back (referring to Frederickson and O'Rear). Doc. 31-1 at 42.  Fleenor testified that he had "top notch" personnel evaluations and that "not one soul" was happy about his departure. Doc. 31-1 at 47.

Additionally, Fleenor could perform a wide variety of tasks and positions at the mine.  He had experience as a longwall shear operator, headgate operator, and

---

[8] Fleenor did not know Jones' exact position, stating that Jones "was something over the prep plant." Doc. 31-1 at 9.

longwall mechanic, among other mining positions. Doc. 31-1 at 15.  He was able to "run every piece of equipment underground and outside except for a bulldozer." Doc. 31-1 at 15.  According to Fleenor, his shift regularly outperformed the day's other two shifts. Doc. 31-1 at 22.  While some of these statements may be self-serving, this alone does not discount their relevance at the summary judgment stage. *Liebman*, 808 F.3d at 1299.  Accordingly, Fleenor has successfully demonstrated that he was qualified for his position for the purposes of his *prima facie* case.

Fleenor also has satisfied his burden to demonstrate that he was replaced by a substantially younger employee.  The record reflects that Fleenor was replaced at the longwall shift foreman position by a combination of Chris Smith, Perry Scarborough, Chris Gable, and Gilbert Saba. Doc. 31-1 at 55 & 31-2 at 29; Doc. 38-3.  WMC admits that, at a minimum, Chris Smith was "among several individuals" who replaced Fleenor. Doc. 30 at 17.   Smith was 33 when Fleenor left, while Frederickson estimates that Gable was in his mid-40s, Scarborough was in his late-40s, and Saba was in his early- to mid-50s. Doc. 38-3; Doc. 31-2 at 29–30.  The defendants argue that three of the four replacements were in Fleenor's protected age group and therefore cannot be considered substantially younger than him.  But this is a mischaracterization of the law.  "The fact that one person in the protected class has lost out to another person in the protected class is . . . irrelevant, so long as he has lost out *because of his age*." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S.

308, 312 (1996).   Seven years, which is the smallest approximated difference between Fleenor and his oldest replacement, generally qualifies as "substantially younger" under the ADEA. *See, e.g.*, *Liebman*, 808 F.3d at 1299 (holding that a seven-year difference "qualifies as substantially younger" and gathering cases holding that differences as small as three years met the "substantially younger" threshold).   Thus, Fleenor has successfully demonstrated that he was replaced by someone substantially younger.   Fleenor has made out a *prima facie* case of age discrimination.

### 2.   McDonnell Douglas *Burden-Shifting*

At the first stage of the *McDonnell Douglas* burden-shifting framework, the burden is on the defendants to come forth with evidence of "a legitimate, nondiscriminatory reason for the adverse employment action." *Kragor*, 702 F.3d at 1308.   This is a burden of production, not persuasion, and the defendants need not persuade the court that they were actually motivated by the nondiscriminatory reason. *Id.*   "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* (internal quotation marks omitted).   WMC has put forth demonstrable evidence that it did not believe Fleenor was meeting performance metrics as a shift foreman.   Specifically, Fleenor's supervisors testified to five occasions on which he failed to start a shift on time.   Additionally, supervisors observed that Fleenor appeared "lost" without his assistant

foreman and heard complaints from employees on his shifts about maintenance delays. Frederickson cited these performance issues as the reason for his decision to demote Fleenor and place him in a less demanding role. Fleenor casts doubt on the veracity of this testimony, claiming that he was not counseled about the majority of these alleged incidents. Indeed, there is no contemporaneous documentation in the record of the purported delays or the counseling sessions Frederickson identified. But, at this stage, the defendants need only proffer a legitimate reason for the decision. They have done so.

Fleenor thus has the opportunity to demonstrate that WMC's stated reason for its decision "is a pretext for discrimination." *Kragor*, 702 F.3d at 1308.[9] He can do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "In other words, the plaintiff has the opportunity to come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th

---

[9] Courts frequently describe the burden as shifting back to the plaintiff at the pretext stage, "but it is more accurate to say that once the employer offers evidence of a legitimate, nondiscriminatory reason for the adverse action, the *McDonnell Douglas* framework—with its presumptions and burdens—disappears, and the sole remaining issue is discrimination *vel non*." *Kragor*, 702 F.3d at 1308 n.1 (internal quotation marks omitted and alterations adopted).

Cir. 1997).  "If a plaintiff produces sufficient evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer." *Kragor*, 702 F.3d at 1309.  "The opportunity provided to a plaintiff to show pretext is simply an opportunity to present evidence from which the trier of fact can find unlawful discrimination." *Id.* at 1308 n.1.

To demonstrate pretext, Fleenor makes two primary arguments: (1) that he was confronted about only two discrete performance issues, and (2) that Frederickson made several comments about his age, including one just weeks before the end of his employment.  Fleenor contends that he was confronted on only one of the five alleged instances of late-starting shifts and on one other occasion—the case of the damaged coal chute.

"When a plaintiff chooses to attack the veracity of the employer's proffered reason, the inquiry is limited to whether the employer gave an honest explanation of its behavior." *Kragor*, 702 F.3d at 1310–11 (internal quotation marks omitted). Where multiple inferences can be drawn from a set of facts, "reasonable inferences are to be drawn in favor of the party opposing summary judgment." *Id.* at 1311. Summary judgment may be precluded where a plaintiff "cast[s] sufficient doubt on [the employer's] proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that [its] proffered legitimate reasons were not what actually

motivated its conduct." *Combs*, 106 F.3d at 1538.

Fleenor claims that Frederickson made "approximately six remarks" about his age in the last year of his employment. Doc. 38 at 25; *see also* Doc. 31-1 at 11.  On one occasion, when discussing a misunderstanding among WMC workers about Fleenor's job status while he was on an injury-related leave of absence, Frederickson asked, "How old are you, again?" Doc. 31-1 at 11.  Fleenor replied, "You know exactly how old I am," and explained that he was 63 years old and would turn 64 during the next month. Doc. 31-1 at 11.  Frederickson offered that "maybe you just need to go ahead and move on," to which Fleenor replied that he planned to work until he was 66. Doc. 31-1 at 11.  Fleenor does not remember the other dates on which Frederickson asked him about his age, but testified that the first occurred soon after Frederickson joined WMC. Doc. 31-1 at 39.  Fleenor did not remember specific details of the other occasions Frederickson inquired about his age. Doc. 31-1 at 40. Fleenor also testified that in 2016 he said to O'Rear, "Well, I guess I'm the oldest man on the property, now."  O'Rear replied, "I can tell you one thing, I don't think that's a good thing." Doc. 31-1 at 28.

The court concludes that Fleenor has submitted sufficient evidence to create a triable issue of fact as to whether his purported performance issues were a pretext for age discrimination.  According to Fleenor, he was confronted about performance issues only twice.  The discrepancy between WMC's record evidence of five

performance issues, none of which were documented contemporaneously, and the two addressed at the meeting regarding Fleenor's demotion cast some doubt on WMC's proffered reason for Fleenor's demotion and could lead a reasonable juror to conclude that WMC is not providing an "honest explanation of its behavior." *Elrod v. Sears, Robuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *see also Menefee v. Sanders Lead Co., Inc.*, 786 F. App'x 963, 966–67 (11th Cir. 2019) ("When an employer asserts that it fired the plaintiff for poor performance . . . [the employee] must demonstrate that the employer did not believe that his performance was lacking, and merely used that claim as a cover for discriminating against him based on his age."). Indeed, the only two performance issues Fleenor remembers are the same two issues discussed at the meeting among Fleenor, Frederickson, and Sterling. *See* Doc. 31-1 at 43.

Compounding this doubt are the six age-related comments Fleenor contends Frederickson made, including one in early October 2017, just a few weeks before the demotion meeting. In *Damon v. Fleming Supermarkets of Florida, Incorporated*, 196 F.3d 1354, 1362 (11th Cir. 1999), a supervisor responsible for the plaintiff's termination told the plaintiff's younger successor that he wanted "aggressive, young men" to be promoted. The court found that this remark was "highly suggestive circumstantial evidence from which a jury could infer discriminatory animus" because it could show "probative evidence of the state of

mind of the decision-maker at the time" of the plaintiff's termination. *Id.* The comment also suggested that the decision maker "had an ageist preference for young managers." *Id.* "Given the substance, context, and timing" of the comment, if credited, the court determined that it was "a significant piece of circumstantial evidence." *Id.* On the other hand, stray remarks "isolated and unrelated to the challenged employment decision . . . are not direct evidence of discrimination," though they may "contribute to a circumstantial case for pretext." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) (emphasis omitted).

Here, Fleenor has testified that Frederickson—his direct supervisor and the man who made the decision to demote him—asked him for the sixth time about his age just a few weeks before demoting him. According to Fleenor, when he told Frederickson his age, Frederickson told him that it could be time for him to "move on." The court concludes that, like the comment in *Damon*, this comment, if credited, could demonstrate Frederickson's preference for a younger employee and be probative of his state of mind immediately before he decided to demote Fleenor. Moreover, if a jury believes Fleenor's testimony, Frederickson's comment could be characterized as more than a stray remark since it was the sixth time Frederickson had discussed Fleenor's age in approximately a year and a half. The court finds that this evidence, combined with Fleenor's age and the age of his replacements, could lead a rational trier of fact to infer discriminatory animus from WMC's decision and

determine that its proffered reason for the decision to demote Fleenor is mere pretext for age discrimination. Fleenor's age discrimination claims survive summary judgment.

## C.  Negligent Hiring

To establish a claim for negligent or wanton hiring, training, retention, or supervision, a plaintiff must prove that the allegedly incompetent employee "engage[d] in tortious conduct." *Williams v. United Launch All., LLC*, 286 F. Supp. 3d 1293, 1311 (N.D. Ala. 2018). "The underlying wrongful conduct must constitute a common-law, Alabama tort, not a federal cause of action such as Title VII." *Id.* (internal quotation marks omitted). Without an underlying state-law tort, a negligent hiring, training, retention, or supervision claim fails. *Id.*

As this and other courts in this district have held, "the Alabama statutory cause of action for age discrimination [is] not Alabama common law." *E.g.*, *Shackelford v. Publix Super Markets, Inc.*, 2014 WL 5148461, at *16 (N.D. Ala. Oct. 14, 2014); *see also Gibbons v. CVS Health Corp.*, 2019 WL 4014834, at *9 (N.D. Ala. Aug. 26, 2019) (holding, where a plaintiff alleged that the employer was "on notice" of an employee's allegedly discriminatory conduct, that the plaintiff could not rely on his age discrimination claim as a basis for a negligent or wanton hiring, training, supervision, or retention claim). Accordingly, Fleenor's claim for negligent or wanton hiring, training, supervision, or retention fails as a matter of law.

### D.    Enterprise Liability

Having found that material disputes of fact prevent summary judgment on at least some of Fleenor's claims relating to his employment with WMC, the court must address the extent to which any entity other than WMC could be liable for those claims.   Fleenor argues that both WMC, Inc. and WMC Holdco have liability exposure for WMC's conduct.   WMC, Inc. owns WMC Holdco, which operates as a holding company for various subsidiaries, including WMC. Doc. 30 at 29; *see also* Doc. 38-6 at 46.

By statute only an employer can be held liable under the ADEA. *E.g.*, *Hendon v. Kamtek, Inc.*, 117 F. Supp. 3d 1325, 1328 (N.D. Ala. 2015).   An employer is defined as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 29 U.S.C. § 630(b).   But the Eleventh Circuit has "identified three circumstances in which it is appropriate to aggregate multiple entities for the purposes" of determining the responsible parties in an employment discrimination context. *Lyes v. City of Riveria Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999).   The only one of the three circumstances applicable to the facts at hand is the "integrated enterprise" test, where multiple entities are "highly integrated with respect to ownership and operations." *Id.* (internal quotation marks omitted). To determine whether two entities can be considered joint employers for liability

purposes, courts consider the following factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987).   The term "employer" must be given a "liberal construction." *Id.*

To be considered an integrated enterprise, the entities must be "'highly integrated with respect to ownership and operations.'" *Id.* (quoting *Fike v. Gold Kist, Inc.*, 514 F. Supp. 722, 726 (N.D. Ala. 1981)).   No one factor is controlling, and not every factor must be present. *Lyes*, 166 F.3d at 1341.   A "crucial element" of this examination is whether the entities "exhibit centralized control of labor relations, including tasks such as handling job applications, approving personnel status reports, and exercising veto power over major employment decisions." *Parker v. Columbia Pic. Indus.*, 204 F.3d 326, 341 (2nd Cir. 2000) (internal quotation marks omitted). Indeed, the required showing has been described as "evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary . . . to permit an inference that the parent corporation was a final decision-maker in its subsidiary's employment decisions." *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997).

Although initially adopted by the National Labor Relations Board to determine whether separate corporate entities should be consolidated, *Bruce v. S&H*

*Riggers and Erectors, Incorporated*, 732 F. Supp. 1172, 1175 (N.D. Ga. 1990),
courts have applied the integrated enterprise test in the employment discrimination
context to determine whether "separate entities should be treated as a single,
integrated enterprise when determining whether a plaintiff's 'employer' comes
within the coverage of Title VII [of the Civil Rights Act of 1964]." *Lyes*, 166 F.3d
at 1341.  Moreover, "given the common language and purposes of" Title VII and the
ADEA, courts apply the single enterprise test to age discrimination cases. *E.g.*,
*Bruce*, 732 F. Supp. at 1175; *Lusk*, 129 at 777 (applying the integrated enterprise test
"[t]o determine whether a parent corporation and its subsidiary may be regarded as
a 'single employer' under the ADEA").

WMC asserts that Fleenor has submitted no evidence that the three entities
are interrelated such that they can be considered a joint employer.  The court
disagrees, and finds that there is a question of material fact as to the level of
interrelation between WMC and WMC, Inc.  WMC, Inc. describes itself as a
"holding company" with no operations or assets of its own other than "direct
ownership of 100% of the equity interests of" WMC Holdco, "through which [it]
indirectly hold[s its] operating subsidiaries," including WMC. Doc. 38-6 at 46; *see
also* Doc. 38-6 at 60 (listing WMC as one of WMC, Inc.'s "administrative
headquarters and production facilities"); Doc. 38-7 at 68.  Thus, there is evidence in
the record that the three entities share common ownership and financial control to

27

the extent that WMC is wholly owned by WMC Holdco, which is wholly owned by WMC, Inc.

This shared ownership is the only meaningful record evidence of WMC Holdco's relationship to the other two entities.  There is no other evidence bearing on WMC Holdco's operations, and thus nothing before the court even suggesting that any of the other *McKenzie* factors are satisfied by the relationship between WMC Holdco and WMC.  Instead, the record before the court, including WMC, Inc.'s annual report excerpted above, reveals that WMC Holdco is a shell existing solely for passive ownership of WMC, Inc.'s operating subsidiaries. *See* Doc. 38-6 at 46.  The parties have not identified any evidence establishing, for example, that WMC Holdco has its own employees or carries on any operations independent of its subsidiaries.  Fleenor therefore has not directed the court to any evidence other than common ownership from which it could conclude that the relationship between WMC and WMC Holdco satisfies any aspect of the integrated enterprise test—and common ownership alone is insufficient to create a triable issue of fact. *See Shiflett v. Shores Holding Co., Inc.*, 601 F. App'x 28, 30–31 (2nd Cir. 2015) (granting summary judgment for a holding company where common ownership was "the only factor of the [integrated enterprise] test weighing" in the plaintiff's favor). Accordingly, WMC Holdco is due to be dismissed as a defendant.

Turning back to WMC, Inc., Fleenor has pointed the court to evidence tending

to show at least some level of common management structure and operational interrelation between this entity and WMC. First, there are employees working at the WMC mines who either are employed by WMC, Inc. or directly report to WMC, Inc. employees. For example, Jack Richardson (Frederickson's direct supervisor) serves as the COO of WMC, Inc. Docs. 31-2 at 32 & 38-6 at 140. O'Rear (Fleenor's direct supervisor) reports to WMC, Inc. Chief Executive Officer ("CEO") Walt Scheller. And Sherry Sterling's supervisor in human resources reports to Kelly Gant (WMC, Inc.'s Chief Administrative Officer and Secretary), who reports to Scheller. Doc. 31-3 at 9–10 & 19. Second, in addition to this apparent blending of the WMC and WMC, Inc. management structures, the employees who were deposed in this case did not differentiate between the entities. In fact, while the parties assume in briefing that Frederickson, O'Rear, and Sterling are employed by WMC, they have not identified any direct evidence in the record supporting this assumption. Frederickson testified that he "work[s] for Warrior Met Coal" and admitted that he does not know the difference between WMC, WMC Holdco, and WMC, Inc. Doc. 31-2 at 32. Similarly, O'Rear's declaration states simply that he is "employed by Warrior Met Coal." Doc. 31-13 at 1. And Sterling testified that she does not know which entity hired her, stating, "Warrior Met Coal, that's the only name that I know." Doc. 31-3 at 9. When asked if she viewed WMC and WMC, Inc. as the same company, she replied, "I just know it as Warrior Met Coal." Doc. 31-3 at 10. This

testimony muddies the water and the parties have not directed the court to any documentation clearing up even the simple question of which entity employs these individuals.  As a result of this uncertainty and the known commonality in the management structure, the court must conclude that there is significant evidence in the record of some degree of interrelated operations and management between WMC and WMC, Inc.

There is limited evidence in the record regarding how, specifically, employment decisions are made, and it is therefore unclear whether there is centralized control of labor relations.  Nevertheless, Frederickson testified that he did not have to "run any decisions by" Jack Richardson, and instead would "keep him informed on certain things." Doc. 31-2 at 32.  He did not communicate his decision to demote Fleenor to Richardson. Doc. 31-2 at 32.  Moreover, Sterling testified that she and Frederickson interviewed both hourly and salaried employees and made the hiring decisions.[10] Doc. 31-3 at 21.  Thus, this evidence suggests that WMC made its own personnel decisions without input from WMC, Inc., cutting against a finding of integration.

However, as Fleenor points out, WMC, Inc. describes WMC's mines as its own in its 2017 and 2018 annual reports. *See, e.g.*, Doc. 38-6 at 18 (stating that

---

[10] When asked to identify the entity that "pays the salaries for the employees at the Number 4 mine," however, Sterling generically identified "Warrior Met Coal," again without specifying whether this is a reference to WMC or WMC, Inc. Doc. 31-1 at 20.

WMC, Inc. is "a large scale, low-cost U.S.-based producer and exporter of premium met coal operating two highly productive underground mines in Alabama, Mine No. 4 and Mine No. 7"). WMC, Inc.'s annual reports also describe miners working in WMC mines as WMC, Inc. employees. *See, e.g.*, Doc. 38-6 at 29 ("As of December 31, 2017, we had 1,354 employees, of whom 957 were hourly employees and 397 were salaried employees . . . ."). WMC employees are subject to WMC, Inc.'s Employee Handbook. Doc. 31-3 at 20; *see also* Doc. 38-8. And the Central Mining Office that WMC, Inc. CEO Walt Scheller manages and where his office is located, also houses the WMC employees' personnel files and the employees who conduct background investigations on prospective WMC employees. Doc. 31-3 at 14 & 20–22.

The defendants do little to counter Fleenor's evidentiary basis for the integrated enterprise test. They maintain that there is no evidence indicating that WMC, Inc. made personnel decisions or that Frederickson worked "for or on behalf of either parent company," Doc. 30 at 30, but the defendants all but abandoned their enterprise liability arguments in their reply brief by failing to respond specifically to Fleenor's contentions. Doc. 40 at 16 n.8. Ultimately the court concludes that Fleenor's evidence on the *McKenzie* factors raises a genuine issue of material fact. *McKenzie*, 834 F.2d at 933. Here, as in *McKenzie*, there is demonstrable evidence of "common ownership, and, to some extent, common management." *Id.* The court

therefore finds that the defendants have not carried their burden of coming forth with sufficient evidence to resolve all factual disputes as to whether WMC, Inc. may be exposed to liability under the integrated enterprise doctrine. *See, e.g.*, *Parker*, 204 F.3d at 341 (finding that genuine "factual issues remain[ed] for trial" where the plaintiff introduced evidence, including disability forms and payroll forms listing the defendant as his employer).

To be sure, on this record the court does not find that WMC and WMC, Inc. are, in fact, an integrated enterprise. Fleenor's burden to convince the jury of WMC, Inc.'s liability will be a heavy one, as "[t]he doctrine of limited liability creates a strong presumption that a parent corporation is not the employer of its subsidiary's employees." *Lusk*, 129 F.3d at 778. Rather, the court's conclusion is merely that Fleenor has pointed to sufficient evidence in the record that, when viewed in the light most favorable to Fleenor, indicates that the defendants have failed to meet their burden to demonstrate beyond any genuine dispute of material fact that WMC, Inc. is not liable for the claims against WMC. Summary judgment for WMC, Inc. is due to be denied.

DONE and ORDERED on August 28, 2020.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE